**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| KENDRA FOOR | : |
| | : |
| v. | : |
| | : Civil Action WMN-05-2784 |
| BENEFITS ADMINISTRATION<br>    CORPORATION | : |
| | : |

**MEMORANDUM**

Before the Court is Defendant's Motion for Summary Judgment.  Paper No. 22.  Plaintiff opposed Defendant's motion and filed her own cross motion for summary judgment.  Paper No. 29.[1]  Upon review of the pleadings and the relevant case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Defendant's motion should be granted.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

At all times relevant to this action, Plaintiff was a participant in the Security Workers Health & Welfare Fund (the Fund), a self-insured, multi-employer, health and welfare fund.  She filed suit against the Fund's administrator in the District Court for Baltimore County, alleging that the Fund refused to pay medical bills which she believes should have been covered under her health plan.  Defendant removed the action to this Court on the ground that, as a claim under a plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002(1), it

---

[1] Also pending is Defendant's motion to strike Plaintiff's cross motion for summary judgment on the ground that it is untimely.  Paper No. 32.  That motion will be denied as moot.

arises under federal law and this Court has removal jurisdiction pursuant to 28 U.S.C. § 1441(a).

The central issue in this action is whether the Fund's Board of Trustees made a reasonable determination that certain medical treatment received by Plaintiff was related to a June 6, 2003, automobile accident in which Plaintiff was involved.  If related to the accident, expenses arising out of this treatment would not be covered under the Fund's plan.  Defendant also contends that Plaintiff's claims were properly denied on the additional ground that Plaintiff failed to comply with her obligations under a Subrogation Agreement signed by her on July 1, 2003.  The relevant facts follow.

In the June 6, 2003, accident, the vehicle which Plaintiff was driving was rear-ended and she experienced whiplash. Plaintiff received treatment for the pain associated with the injury at Multi-Specialty Health Care (Multi-Specialty).  On August 13, 2005, Multi-Specialty discharged Plaintiff from further care.  Following discharge from Multi-Specialty, Plaintiff consulted with Drs. Kahan and Syme for complaints in the same parts of the body that were treated by Multi-Specialty. Plaintiff maintains that this treatment was necessitated, however, not by the accident, but by pre-exisiting conditions, including fibromyalgia.

The terms of Plaintiff's health care benefits are set forth

in a Summary of Plan Description.  Def.'s Ex. A.  The Plan provides:

>      If you [are] injured in a car accident or other incident in which someone else is liable, that person (or his/her insurance) is responsible for paying your [] medical expenses.
>
>      . . .
>
>      [A]s a service to you [the participant] the Fund will pay your [] expenses based on the understanding that <u>you are required to reimburse the Fund in full from any recovery</u> you [] may receive, no matter how it is characterized.  This process is called subrogation.
>
>      The Fund extends benefits to you [] only as a service to you.  The Fund must be reimbursed in full if you obtain any recovery from another person or entity's insurance coverage.  The Fund will have first priority against any such recovery.
>
>      The rights to recovery to which the Fund shall be subrogated include, but are not limited to, rights against any person or entity that caused, contributed to, or is responsible for the injury, sickness, or other loss and rights under personal injury protection, financial responsibility, uninsured or underinsured insurance coverage as well as medical reimbursement coverage.  In other words, your acceptance of benefits from the Fund means that you have agreed to reimburse the Fund - in full - for any benefits it has paid from any settlement, judgment insurance, or other payment you [] or your attorney receive as a result of your accident.  It does not matter how these amounts are characterized or why they are paid.  The Fund requires that you [] and your [] attorney fill out, sign, and return to the Fund office a subrogation agreement that includes a questionnaire about the accident.

3

> Your claim will not be deemed complete and will be pended for payment until your fully executed Subrogation Agreement is received by the Fund office. If it is not completed within the time frame for filing your claim, your claim will be denied.
>
> . . .
>
> You [] are required to notify the Fund within ten days of the initiation of any lawsuit arising out of the accident or the conclusion of any settlement or judgment relating to the accident in any lawsuit you or your eligible dependent initiate to protect its claims. The Fund also has a right to intervene in any suit you bring.
>
> . . .
>
> You [] may not waive any rights covering any conditions under which you expect to receive payment. If you are asked to do so, you must contact us immediately.
>
> You [] also must notify the Fund before accepting any payment prior to the initiation of a lawsuit. . . . The Fund may withhold benefits if you [] waive[] any of the Fund's rights to recovery or fail[] to cooperate with the Fund in any respect regarding the Fund's subrogation rights including refusing to sign the Fund's subrogation agreement.

Def.'s Ex. A at 36-37 (emphasis in original).

Consistent with these terms, Plaintiff signed a Subrogation Agreement on July 1, 2003, which contained the following provisions:

> 1) The Fund will pay benefits in accordance with the Plan for covered medical expenses resulting from an illness or injury sustained by me which is caused directly or indirectly by another party. . . .

4

>    2) I acknowledge that under the terms of the Plan, the acceptance of benefits paid to be for (1) an illness or injury caused directly or indirectly by another party . . . constitutes an agreement by me to reimburse the Fund for benefits paid to me up to the full amount I may recover due to the illness or injury.  By accepting benefits from the Fund, I agree that any amounts recovered by judgment, settlement or compromise, regardless of how the amounts recovered may be characterized, are Plan assets and will be applied first to reimburse the Fund.
>
>    3) I acknowledge that under the terms of the Plan, the acceptance of benefits by me constitutes an agreement by me to notify the Fund promptly if suit is files (sic) to recover amounts in connection with an illness or injury for which the Fund has paid benefits, or if I received payment from any source for claims related to such illness or injury.  By accepting payments from the Fund, I agree that neither I nor anyone acting on my behalf will settle any claim related to my illness or injury without the written consent of the Fund.

Def.'s Ex. B.

Pursuant to the terms of the Subrogation Agreement, the Fund paid loss of time benefits to Plaintiff in the amount of $709.85. Informed that Plaintiff had retained the law firm of Saiontz, Kirk & Miles to represent her in pursuing her accident claim, the Fund informed that firm that the Fund had paid this benefit under the Subrogation Agreement and also began forwarding medical bills from health care providers that the Fund believed to be related to the accident.  See Def.'s Ex. D (letters from the Fund to Saiontz, Kirk & Miles dated August 6, 2003, October 2, 2003,

5

February 16, 2004, May 19, 2004, and October 11, 2004).  Saiontz, Kirk & Miles never responded to these letters.

Plaintiff retained new counsel, Robert Zarbin, and on October 19, 2004, the Fund sent a letter to Zarbin informing him of its previous payment of loss of time benefits and attaching a copy of the Subrogation Agreement signed by Plaintiff.  On November 23, 2004, Zarbin sent a letter informing the Fund that he had settled that same day all claims related to the accident for $10,000.  Zarbin further indicated that "[Plaintiff's] opinion is that her treatment, related to this accident, ended when she was released by the doctors at Multi-Specialty on August 13, 2003."  Def.'s Ex. F.  On the basis of that opinion, Zarbin requested that the Fund pay the post-August 2003, bills submitted by Drs. Kahan and Syne[2] and, furthermore, that the Fund reduce its subrogation lien of $709.85 by one third to account for his fee in obtaining the settlement.  Defendant represents, and Plaintiff does not contest, that neither Zarbin or Plaintiff consulted with the Fund or its counsel prior to entering into the settlement.

On December 13, 2004, the Fund's Board of Trustees met and considered Plaintiff's request for payment of the bills from Drs.

---

[2] At this point, the charges from Drs. Kahan and Syne totaled about $11,000.  The charges that Zarbin deemed related to the accident, including the bills from Multi-Specialty Health Care, totaled about $5,000.

6

Kahan and Syne and for a one third reduction of the subrogation lien. As part of that consideration, the Board reviewed medical records, in which Dr. Kahan stated,

> Ms. Foor is a 34-year old female with a history of pain on and off for two or three years. She was originally involved in a work injury which is not work related but has been doing fairly well after being treated for fibromyalgia <u>until she was involved in a motor vehicle accident in June of 2003</u>. According to the patient, she was on Bestgate Road and was rear-ended by another car. <u>Since then</u> she has had intolerable pain that has been interfering with her activities of daily living and lifestyle. The patient has usually been getting good results with various types of medications and able to function fairly well <u>until the motor vehicle accident</u>. The patient was a restrained driver when the accident happened. The patient has been complaining <u>since the accident</u> of pain radiating from the lower back down into the left hip, left buttocks and left leg and then also pain radiating into the right buttocks and right leg.

Def.'s Ex. O (emphasis added).[3] The Board determined that the claims related to Plaintiff's post-August 2003 treatment would be denied because they "continued to reflect a diagnosis consistent with the injury sustained in the automobile accident." Def.'s Ex. I at 4 (minutes of Dec. 13, 2004 Board Meeting). The Board

---

[3] Defendant's citation for this quotation is Defendant's Exhibit M, which is an amended version of Dr. Kahan's notes, discussed <u>infra</u>. The unamended version, which would have been the version reviewed by the Board of Trustees at its December 13, 2004 meeting, was submitted by Plaintiff in the state district court, appended to her "Notice of Introduction of Medical Reports and Bills. <u>See</u> Def.'s Ex. O.

7

also concluded that it would not reduce its lien to cover attorney's fees.  The Board notified Plaintiff's counsel of these decisions by letter dated December 15, 2004.  Def.'s Ex. J.

Plaintiff's counsel responded by letter dated January 13, 2005.  While acquiescing to the Board decision regarding the loss of time benefits and enclosing a check for $709.85, Zarbin continued to challenge the Fund's decision not to cover post-August, 2003 expenses.  He relates, "[my] client has had specific conversations with the medical care providers and they have instructed her that <u>while the accident certainly worsened her condition</u> her underlying condition was the cause for the other medical bills."  Def.'s Ex. K (emphasis added).  Zarbin also asserted that only the pre-August 2003 bills were used to negotiate settlement.  Id.

On May 19, 2005, Zarbin sent another letter to the Fund attaching an amended record from Dr. Kahan.  Def.'s Ex. M.  In the amended record, Dr. Kahan includes the following paragraph:

> ADD: Apparently I need to state clearly that the patient had a problem before the accident <u>but this accident exacerbated her pre-existing condition</u>.  All treatment in our office were (sic) due to her pre-existing condition.

Id. (emphasis added).  Finding nothing in this amended report to lead it to alter its previous conclusion, the Fund again denied benefits and informed Zarbin of the same by letter dated May 26, 2005.  Def.'s Ex. N.  Zarbin then filed this suit on Plaintiff's

behalf.

## II. DISCUSSION

A. Reasonableness of the Fund's Determination

The framework for reviewing a denial of benefits under a plan covered by ERISA begins with the de novo determination by the court of whether the language of the plan grants the administrator discretion to determine a claimant's eligibility for benefits.  See Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000).  If no discretion is granted, then the Court must review the benefit decision de novo.  If, however, the language of the plan confers discretion, then the reviewing court will overturn the decision only for an "abuse of discretion" by the claims administrator.  See id. (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989)).  This deferential standard of review requires that a reviewing court not disturb an administrator's decision if it is reasonable, even if the court would have reached a different conclusion.  This abuse of discretion standard applies, "because the plan, in conferring discretion on a trustee with respect to a specific matter, deliberately yields to the trustee's judgment on that matter, as long as it is reasonable.  The plan thus recognizes that on such a matter, various reasonable decisions and interpretations could be made, and it accepts, as a contractual term of the plan, the range of decisions that a trustee could reasonably make."

9


<u>Coluccie v. Agfa Corp. Severance Pay Plan</u>, 431 F.3d 170, 176 (4th Cir. 2005).

Here, there is no dispute that the policy in question gives Defendant discretionary authority to determine eligibility for benefits. The Plan expressly provides that "[t]he Board of Trustees has the power and sole discretion to interpret, apply, construe and amend the provisions of the Plan and make all factual determinations regarding the construction, interpretation and application of the Plan." Def.'s Ex. A at 40. Thus, the Court will review Defendant's decision under an abuse of discretion standard and will deny Defendant's motion only if, drawing all inferences in favor of Plaintiff, the Court could conclude that the Trustee's decision was unreasonable.

Plaintiff's primary argument, both in opposing Defendant's motion and supporting her own, is that the parameters of the accident claim is to be determined, not under ERISA, but under Maryland common law. Opp. 6-8. Plaintiff's counsel contends that, under Maryland common law, Defendant was required to name a medical expert in this action to offer testimony that would causally relate the post-August 2003 treatment to the accident. Pl.'s Mot. 4. Defendant's failure to name such an expert, according the Plaintiff's counsel, entitles Plaintiff to summary judgment. <u>Id.</u> 5.

Assuming, without deciding, that Plaintiff's counsel is

10

correct that the Board of Trustees should have looked to Maryland common law to determine if the post-August 2003 medical expenses reasonably could have been causally connected to the automobile accident, his argument based upon that assumption falls quickly apart.  It is a long established principle of the common law, in Maryland and elsewhere, that a tortfeasor must "take the victim as he finds him or her."  Under this principle, "[a]n injured person is entitled to recover full compensation for all damages that proximately result from a defendant's tortuous act, even if some or all of the injuries might not have occurred but for the plaintiff's preexisting physical condition, disease, or susceptibility to injury."  2 Stein on Personal Injury Damages 3d § 11.1.  This is often referred to as the "egg shell" plaintiff principle.[4]  See also, Freeman v. Busch, 349 F.3d 582, 590 (8th Cir. 2003) (while "the general rule is that a defendant is only

---

[4] Courts also refer to this rule as the "thin skulled" plaintiff rule or the "eggshell skull" rule.  See Gorman v. Prudential Lines, Inc., 637 F. Supp. 879, 882 (S.D.N.Y. 1986) ("Under the well-established 'thin-skulled plaintiff' rule, a tort-feasor must take the victim 'as it finds him,' and is responsible for any aggravation or acceleration of an existing disease or infirmity if the defendant's breach of duty 'played any part, even the slightest' in producing the injury.") (quoting Milos v. Sea-Land Service, Inc., 478 F. Supp. 1019, 1023 (S.D.N.Y. 1979)); Larroquette v. Cardinal Health 200, Inc., 466 F.3d 373, 380 (5th Cir. 2006) ("[E]very first-year tort student is well versed in the rule of the 'eggshell skull' plaintiff, and his right to collect for even unexpected consequences of a relatively minor contact.").

11

liable for the injuries he causes . . . a plaintiff may also recover for a prior condition if a defendant's conduct exacerbated a pre-existing condition").

This rule has long been a part of the Maryland common law. In an 1883 decision of the Maryland Court of Appeals, <u>Baltimore City Passenger Railway Co. v. Kemp</u>, 61 Md. 74, 81, Judge Alvey, opined:

> It is the common observation of all, that the effects of personal physical injuries depend much upon the peculiar conditions and tendencies of the persons injured; and what may produce but slight and comparatively uninjurious consequences in one case, may produce consequences of the most serious and distressing character in another.  And this being so, a wrong-doer is not permitted to relieve himself from responsibility for the consequences of his act, by showing that the injury would have been of less severity if it had been inflicted upon anyone else of a large majority of the human family.

This Court applied the principle just last year, observing "[t]he law in Maryland is clear that <u>a tortfeasor is responsible for any aggravation of a pre-existing condition</u>, even where that condition constitutes an injury or disability.  <u>Lawson v. United States</u>, 454 F. Supp. 2d 373, 416 (D. Md. 2006) (citing <u>Harris v. Jones</u>, 380 A.2d 611, 616 (1977); <u>Feeney v. Dolan</u>, 371 A.2d 679, 688 (1977)) (emphasis added).

In light of this long-standing principle, the Fund's conclusion that claims arising out of Plaintiff's post-August 2003 treatment were part of the automobile accident claim is unquestionably reasonable.  Defendant need not support its decision here with the testimony of a medical expert for its

decision is supported by the very evidence relied upon by Plaintiff: the report of her treating physician.  Dr. Kahan's original report stated that Plaintiff was "doing fairly well," despite her fibromyalgia, "until she was involved in a motor vehicle accident."  "[S]ince the accident" she had complaints about pain.  Dr. Kahan's clarification at the request of Plaintiff's counsel only strengthens the reasonableness of the Fund's conclusion.  He adds to his report: "[T]he patient had a problem before her accident but this accident exacerbated her pre-existing condition."

In light of this evidence, no factfinder could conclude that the Fund was unreasonable in denying Plaintiff's claims arising from the treatment of Drs. Kahan and Syne.[5]  These were damages that under Maryland law could and should have been pursued against the tortfeasor.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's cause of action under ERISA.

### B. Plaintiff's Breach of the Subrogation Agreement

---

[5] Plaintiff's counsel apparently placed great weight on the fact that "Ms. Foor's opinion is that her treatment, related to this accident, ended when she was released by the doctors at Multi-Specialty on August 13, 2003."  Def's Ex. F (Plaintiff's counsel's Nov. 23, 2004 letter to the Fund); see also Pl.'s Opp 2 ("The significance of the break in the causal link was not lost on Ms. Foor.  She advised her counsel that the additional treatment was not accident-related.").  Plaintiff, of course, is not expected to be knowledgeable as to principles of tort law that might seem surprising to the layperson.  Counsel, however, is.  Plaintiff's opinions as to the legal ramification of her injuries and treatment are of no moment and on this issue, counsel should have been advising Plaintiff, not Plaintiff counsel.

13

Plaintiff's breach of the Subrogation Agreement provides an additional ground for denying Plaintiff's claims for post-August 2003 treatment. Plaintiff agreed that "neither [she] nor anyone acting on [her] behalf will settle any claim related to [her] illness or injury without the written consent of the Fund." Def.'s Ex. B. Despite this agreement, Plaintiff's counsel settled the accident claim with no notice, whatsoever, to the Fund. This breach is material in that it deprived the Fund the opportunity to intervene in the suit as it was clearly entitled to do under the terms of the Plan.[6] Def.'s Ex. A at 37. The Court notes that, at the time Plaintiff's counsel entered into settlement, he was fully aware both of Plaintiff's obligations under the Subrogation Agreement, as well as of the Fund's position that the post-August 2003 treatments were accident related. Plaintiff's counsel offers nothing to explain this breach.

## III. CONCLUSION

---

[6] Had Plaintiff's counsel provided notice to the Fund so that the Fund could have intervened, the scope of the accident-related injuries could have been litigated. Had the factfinder in the tort litigation determined that the post-August 2003 claims were accident related, Plaintiff's expenses would have been covered by the jury award. Had the factfinder found that they were not related, that finding would have be binding on the Fund. See MetraHealth Ins. Co. v. Drake, 68 F. Supp. 2d 752 (E.D. Tex. 1999) (where trial judge in tort action allocated medical expenses between those caused by accident and those related to pre-existing condition, issue preclusion barred medical plan that had declined to intervene from challenging that allocation).

14

It is indeed an unfortunate situation that appears to leave Plaintiff with a settlement that is inadequate to cover her medical expenses.  The fault for this situation, however, lies not with the Fund, but with the inadequate assessment of Plaintiff's tort claim, compounded by the failure to communicate with the Fund prior to entering into the settlement.  Finding no abuse of discretion on the part of the Fund, the Court must grant Defendant's motion for summary judgment.  A separate order will issue.

                                                  _____/s/_____
                                                  William M. Nickerson
                                                  Senior United States District Judge

Dated: February 27, 2007